PUBLIC CITIZEN, INC., Aviation Consumer Action Project, and Families of Pan–Am 103/Lockerbie, Petitioners,

v.

FEDERAL AVIATION ADMINISTRATION, Respondent.

No. 91–1509.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 17, 1993.

Decided March 26, 1993.

Leslie A. Brueckner, with whom Patti A. Goldman and Alan B. Morrison were on the brief, for petitioners.

Robert V. Zener, Atty., Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., and Carla J. Martin, Counsel, Federal Aviation Admin., were on the brief, for respondent.

Before MIKVA, Chief Judge, and WILLIAMS and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

In this case, petitioners challenge rules the Federal Aviation Administration ("FAA") adopted pursuant to the Aviation Security Improvement Act of 1990 ("ASIA"), 49 U.S.C.App. § 1357(h) (1988 & Supp. II 1990), arguing that the rules, standing alone, are not detailed enough to satisfy ASIA. To the extent the FAA's defense of those rules relies on other rules withheld from the public for security reasons, petitioners argue that the FAA's failure to publish the secret rules in the *Federal Register* and to allow public notice and comment violated both the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 (1988), and the Administrative Procedure Act ("APA"), 5 U.S.C. § 553 (1988).

Deferring to the FAA's interpretation of ASIA, we uphold the rules as adopted, and in particular, conclude that Congress clearly intended for the FAA to retain the authority to promulgate security-sensitive rules in secret, as it had before ASIA's enactment. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). We further conclude that the FAA rationally determined that to disclose the information petitioners seek would jeopardize passenger safety, within the meaning of 49 U.S.C.App. § 1357(d)(2) (1988 & Supp. II 1990). Accordingly, we deny the petition for review.

## I. BACKGROUND

In 1988, terrorists succeeded in bombing Pan Am flight 103 over Lockerbie, Scotland, killing all passengers on board. In response, the President created the Com-mission on Aviation Security and Terrorism ("Commission") to conduct a "comprehensive study and appraisal of practices and policy options with respect to preventing terrorist acts involving aviation." Exec. Ord. No. 12,686, *reprinted in* 54 Fed.Reg. 32,629 (1989). The following year, the Commission concluded its study and issued a report concluding that "the U.S. civil aviation security system is seriously flawed ... [and] needs major reform." *Report of the President's Commission on Aviation Security and Terrorism,* at i (1990) (hereinafter, *"Report "*). Part of the problem, according to the Commission, is that "FAA has provided to the airlines and airports very little guidance and few standards for their use" in combatting acts of terrorism. *Id.* at 55.

Congress sought to remedy the problem by enacting the Aviation Security Improvement Act of 1990, 49 U.S.C. App. § 1357(h). ASIA directed the FAA to adopt rules, no later than 270 days from its effective date, prescribing, *inter alia,* "minimum training requirements for new employees," *id.* § 1357(h)(1), and "minimum staffing levels." *Id.* § 1357(h)(3).

Pursuant to the congressional mandate, the FAA issued a Notice of Proposed Rulemaking ("NPRM") on April 2, 1991. *See* 56 Fed.Reg. 13,552 (1991). The NPRM set forth the requirements the FAA proposed to add in order to comply with ASIA, *see id.,* but emphasized that the FAA could not provide more specific guidance in public rules of general applicability. The FAA gave two reasons for that conclusion. First, "[b]ecause of the unique nature of each airport, ... training specified in a wide-reaching regulation c[an] speak only to general concepts." *Id.* at 13,553. Rather than attempt to fashion more detailed training standards, the FAA "chose[ ] to present a list of required topics around which airport operators must build customized curricula," to which airport operators would be "encouraged" to add "topics of local concern." *Id.* at 13,553–54.

The second reason the FAA gave for not providing more detailed guidance in the rules was that disclosing too much detail

would undermine the integrity of airport security procedures. As the FAA viewed matters, making more specific information or criteria publicly available "could assist anyone in attempting to breach security," *id.* at 13,554, and "[i]f such information became available to a person with criminal or terrorist intent, it could focus that person's attention on specific techniques to counter otherwise effective security systems." *Id.* at 13,555. For these reasons, the FAA explained, although the NPRM "proposes general requirements for minimum employment standards for airport operators and air carriers, the security-sensitive instructions tailored to the particular needs of each airport and air carrier and contained in FAA–approved security programs are not specified in the rule." *Id.* at 13,552.

In declining to release the "security-sensitive instructions" to be provided in the individualized security programs, the FAA, after making the required findings, *see* 56 Fed.Reg. at 13,552, invoked its authority to withhold such information. *See* 49 U.S.C.App. § 1357(d)(2); 14 C.F.R. § 191.1 *et seq.* (1992) (implementing § 1357(d)(2)); *see also* 14 C.F.R. § 191.3(b)(2)–(3) (exempting security programs from public disclosure). Section 1357(d)(2) provides, in relevant part, as follows:

> Notwithstanding section 552 of Title 5 relating to freedom of information, the [FAA] Administrator shall prescribe such regulations as he may deem necessary to prohibit disclosure of any information obtained or developed in the conduct of security or research and development activities under this subsection if, in the opinion of the Administrator, the disclosure of such information—
>
> (C) would be detrimental to the safety of persons traveling in air transportation.

49 U.S.C.App. § 1357(d)(2)(C), *as amended by* Omnibus Budget Reconciliation Act of 1990, Pub.L. No. 101–508, 104 Stat. 1388 (1990) (broadening § 1357(d)(2) to apply to information obtained or developed in the conduct of "security activities").[1]

However, the FAA assured the public that "[s]pecific staffing criteria are being developed and will be presented in a proposed revision to the carriers' security programs." 56 Fed.Reg. at 13,554. The FAA made the same assurances as to the updated training requirements. *See id.* at 13,-555–56 (stating that "[i]n conjunction with this rulemaking action, current standards for pre-employment qualifications, training and recurrent training, and testing of screening personnel would be strengthened through a corollary proposed security program revision").

Several commenters were not satisfied with the FAA's assurances. One commenter, Billie H. Vincent, the FAA's former Director of Security, objected that "[t]here is no [legitimate] reason for withholding the minimum amounts of training for security personnel from the public's oversight," *Comments of Billie H. Vincent*, at 1 (Apr. 2, 1991), because "one only has to fear revealing inadequate requirements." *Id.* at 4. Indeed, Vincent argued, greater public disclosure of training standards "can strengthen the deterrent value of an aviation security program," unless, of course, the requirements tolerate a security system that is "weak and ineffectual." *Id.* at 3. Additionally, Public Citizen, Inc. ("Public Citizen"), argued that because any member of the public would be able to see how many employees were at each checkpoint, minimum staffing levels are not security-sensitive. Furthermore, Public Citizen, Aviation Consumer Action Project ("ACAP") and others also objected to the FAA's decision to promulgate detailed standards in secret rules as a violation of the notice-and-comment requirements of the APA and FOIA's publication requirement.

The FAA apparently decided the commenters were correct as to minimum aptitude and physical requirements and therefore decided to address those issues in the final rules. *See* 56 Fed.Reg. 41,412, 41,419 (1991). Nevertheless, the FAA continued to withhold disclosure in greater detail of training and staffing requirements on the

---

**1.** The FAA's implementing regulations have not been amended to reflect the 1990 amendment.

ground that such information was "of a security-sensitive nature or involved individualized details of specific security programs." *Id.* at 41,421. Apart from its invocation of 49 U.S.C.App. § 1357(d)(2) and the implementing regulations, the FAA did not specifically address Public Citizen's APA and FOIA arguments. On August 20, 1991, seven days after the ASIA deadline, the FAA issued the final rules with the same degree of specificity as proposed, with the exception of the minimum aptitude and physical requirements. *See* 56 Fed. Reg. 41,412 (1991) (codified at 14 C.F.R. § 107.7 *et seq.* (1992)).

Public Citizen, ACAP and Families of Pan–Am 103/Lockerbie (collectively, "petitioners") then filed the instant petition for review on November 22, 1991. On December 10, 1991, the FAA filed a "Certified List of Documents Comprising the Record," which included the Commission's report, the NPRM, the public comments thereon, and the final rules. Petitioners then moved for an order, pursuant to Fed. R.App.P. 16(a), compelling the FAA to supplement the record to include the secret security programs and related materials for review by counsel for petitioners. The FAA objected, arguing, *inter alia*, that it had not yet completed its post–ASIA revisions to airport and air carrier security programs. In January 1992, petitioners also moved for summary disposition of their petitions for review, on the ground that the FAA had conceded that it had not complied with ASIA's 270–day time limit for issuing the new rules. The motion for summary disposition was denied, and the motion to supplement is now before us, along with the petition for review.

## II. Discussion

Petitioners claim that the FAA's training and staffing requirements are not sufficiently detailed to satisfy ASIA, at least standing alone. As a result, they argue, the FAA must, and in both the NPRM and the notice accompanying the final rules did, fall back on the security programs it is in the process of modifying pursuant to ASIA. To the extent the FAA does rely on the security programs, they contend, its

failure to allow public notice and comment on those programs violated both the APA and FOIA. We address each argument in turn below.

### A. The Airline Security Improvement Act of 1990

#### 1. Final Rules Addressing Staffing

It appears to us that five provisions of the final rules pertain to staffing. First, the rules require each air carrier to "staff its security screening checkpoints with supervisory and non-supervisory personnel in accordance with the standards specified in its security program." 14 C.F.R. § 108.9 (1992). Second, air carriers must staff each security screening checkpoint with screeners who, either by education or experience, are "equipped ... to perform the [screening] duties," 14 C.F.R. § 108.31(a) (1992), and who possess enumerated "[b]asic aptitudes and physical abilities" necessary for security screening. 14 C.F.R. § 108.31(a)(2) (1992). Third, each airport must employ a "Ground Security Coordinator" whose responsibilities would include "[r]eview[ing] all security-related functions for effectiveness and compliance with" FAA rules, Security Directives, and the security programs. 14 C.F.R. § 108.-29(a)(2)(i) (1992). The Ground Security Coordinator would also be responsible for "[i]mmediately initiat[ing] corrective action for each instance of noncompliance." 14 C.F.R. § 108.29(a)(2)(ii) (1992).

Fourth, the rules require each air carrier to staff each security screening checkpoint abroad during passenger screening with at least one employee who can "functionally read and speak English." 14 C.F.R. § 108.-31(f) (1992). Finally, the rules prohibit staffing security screening checkpoints with screeners who either have failed the required operational test for screening competence until they have "successfully completed the remedial screening training specified in the [air carrier's] security program," 14 C.F.R. § 108.31(c) (1992), or have not undergone formal training, unless such screener receiving on-the-job training "is closely supervised and does not make inde-

pendent judgments as to whether persons or property may enter [restricted areas] without further inspection." 14 C.F.R. § 108.31(b) (1992).

### 2. Final Rules Addressing Training

We perceive the final rules to impose four requirements with respect to training. First, the rules require that anybody having access to "security identification display areas" ("SIDAs")[2] be trained regarding matters to be provided for in the FAA–approved "curriculum specified in the security program," 14 C.F.R. § 107.25(e) (1992), as well as: (a) "[c]ontrol, use, and display of airport-approved identification or access media;" (b) "[c]hallenge procedures and the law enforcement response which supports the challenge procedure;" (c) "[r]estrictions on divulging information concerning an act of unlawful interference with civil aviation;" and, (d) "[n]ondisclosure of information regarding ... security systems." 14 C.F.R. § 107.25(e)(1)–(4) (1992).

Second, the rules require that security screeners who fail the above training "successfully complete[ ] the remedial screening training specified in the ... security program." 14 C.F.R. § 108.31(c) (1992). Until they do so, such screeners cannot perform screening functions. *Id.* Third, the rules require air carriers to advise all employees or contractors performing security-related functions of the FAA's regulations and Security Directives and Information Circulars, in addition to the requirements of the security programs. 14 C.F.R. § 108.-29(a)(1) (1992). Lastly, the rules obligate air carriers to provide formal, as opposed to on-the-job, training for security screeners, unless any screener receiving the latter type of training "is closely supervised and does not make independent judgments as to whether persons or property may enter [restricted areas] without further inspection." 14 C.F.R. § 108.31(b) (1992).

### 3. The FAA's Interpretation of ASIA

■ The issue thus becomes: Are the final rules outlined above sufficiently detailed to constitute "minimum staffing levels" and "minimum training requirements" under ASIA? 49 U.S.C.App. § 1357(h). Because Congress committed ASIA to the FAA's administration, *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984), and its progeny provide the applicable standard of review. As we recently summarized that standard:

> Under the *Chevron* analysis, judicial review of an agency's interpretation of a statute under its administration is limited to a two-step inquiry. At the first step, we inquire into whether Congress has directly spoken to the precise question at issue. If we can come to the unmistakable conclusion that Congress had an intention on the precise question at issue, our inquiry ends there; this Court naturally must give effect to the unambiguously expressed intent of Congress.
>
> However, if the statute before us is silent or ambiguous with respect to the specific issue before us, we proceed to the second step. At this stage, we defer to the agency's interpretation of the statute if it is reasonable and consistent with the statute's purpose; we are not free to impose our own construction on the statute, as would be necessary in the absence of an administrative interpretation.

*Nuclear Info. Resource Serv. v. Nuclear Regulatory Comm'n*, 969 F.2d 1169, 1173 (D.C.Cir.1992) (en banc) (citations, internal quotation marks, and brackets omitted).

#### a. *Minimum Staffing Levels*

■ Petitioners argue that ASIA's requirement that the FAA establish minimum staffing levels plainly requires the FAA "to specify the actual number of personnel, or at least some performance standards relat-

---

**2.** SIDAs are "any area[s] identified in the airport security program as requiring each person to continuously display ... an airport-approved identification medium unless [the person is] under airport-approved escort." 14 C.F.R. § 107.-25(a) (1992). Examples of areas that will often constitute SIDAs are secured areas, air operations areas and cargo/baggage make-up areas. *See* 56 Fed.Reg. at 13,553.

ing to the number of security personnel that must operate a screening checkpoint or a formula by which such number can be determined (*e.g.*, one screener per every 1,000 passengers per day)." Reply Br. at 4. Because the rules fail to do either, petitioners argue, they violate ASIA. We do not agree.

As always, we have an "obligation to give 'dispositive effect' to clear statutory language." *Association of Accredited Cosmetology Schools v. Alexander*, 979 F.2d 859, 863 (D.C.Cir.1992) (quoting *International Union, United Auto., Aerospace and Agric. Implement Workers of America v. General Dynamics Land Sys. Div.*, 815 F.2d 1570, 1575 (D.C.Cir.1987)). However, the term "minimum staffing levels" is far from clear in its meaning. We find nothing elsewhere in the text or in the legislative history from which we might conclude—much less, *unmistakably* conclude—that Congress intended for the FAA to issue staffing rules with the specificity petitioners seek. The question then becomes whether the FAA's interpretation of "minimum staffing levels" is a permissible one. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). We believe that it is.

As the FAA observes, the Commission's report, on which Congress relied in enacting ASIA, does not suggest that the security problem in American civil aviation was attributable to a dearth of security personnel. Indeed, from all that appears in the report, the Commission seems to have been of the view that existing security personnel were inadequately trained to protect against terrorist acts. *See, e.g., Report*, at 55 (faulting the FAA for "ha[ving] paid little attention to how to recruit, train and motivate a security force" and stating that "effective security screening requires well-trained people operating the best equipment available"). Therefore, the FAA's interpretation of ASIA to allow it to focus on the quality, rather than the quantity, of security personnel was at least a permissible one—one we are bound to accept under *Chevron*.

### b. *Minimum Training Requirements*

Petitioners argue that the FAA's final rules fail (apparently at either step of the *Chevron* analysis) to establish minimum training requirements as ASIA directed. In so arguing, petitioners assert that only the rules contained in Part 108, entitled "Airline Operator Security," can be considered. Stated negatively, Part 107 of the rules, which is entitled "Airport Security," is irrelevant for purposes of this case, according to petitioners, because only Part 108 applies directly to air carriers. Part 107's application to air carriers is so limited as to be irrelevant to ASIA's demand for minimum training requirements.

Petitioners put a fair number of their eggs in that basket. As a result, petitioners do not address the sufficiency of the training requirements set forth in Part 107. Instead, they attack only the two training requirements contained in Part 108—that air carriers (1) inform all employees or contractors performing security-related functions of the FAA's regulations and Directives, as well as the requirements of the air carrier's FAA-approved security program; and (2) prevent security screeners who fail the required operational test for screening competence from performing screening functions until they have completed the remedial screening training specified in the security program. *See* 14 C.F.R. §§ 108.29(a)(1), 108.31(c) (1992).

Petitioners' attack on Part 108's two training requirements are as follows. Since the first requirement, by the FAA's own admission, "ha[d] been implicit in part 108 and the air carrier security programs" even before ASIA's enactment, *see* 56 Fed. Reg. at 13,555, it can hardly be said that its adoption did anything to satisfy ASIA. As for the second requirement, it only mandates remedial training whereas petitioners read ASIA to require initial and recurrent training for all employees, not just remedial training for deficient employees. Lastly, the second training requirement (like one of the staffing requirements) is explicitly tied to air carriers' security programs, which belies the FAA's claim that the final rules, standing alone, fulfill ASIA's re-

quirements. For these reasons, petitioners argue that the final rules fail to establish "minimum training requirements" within the meaning of ASIA. 49 U.S.C.App. § 1357(h).

Petitioners' training argument demonstrates the hazards of putting one's eggs into a single basket, for we reject petitioners' attempt to parse the final rules into two parts hermetically sealed off from one another. As the FAA argues, Part 107 must be considered, along with Part 108, in deciding whether the final rules satisfy ASIA. Part 107 *does* apply to air carriers, if only derivatively. *See* 56 Fed.Reg. at 41,414 ("[t]o the extent that some air carrier employees performing development, construction or other duties at airports are issued identification media providing access to the SIDA by an airport, limited site-specific airport training would be required for each person issued such identification"). The two parts plainly complement each other, and it is together, regulating air carrier and airport security, that they attempt to strengthen the security of the American civil aviation system against acts of terrorism. Thus, we decline to evaluate Part 108 in isolation from Part 107.

There is truth in petitioners' assertion that the final rules are dependent on the security programs. Several of the rules both as to training and staffing explicitly incorporate requirements contained in the security programs. *See, e.g.,* 14 C.F.R. § 108.31(c) (1992) (requiring all security screening personnel who have failed the required operational test for screening competence to "successfully complete[ ] the remedial screening training specified in the [air carrier's] security program"); 14 C.F.R. § 108.9(d) (1992) (requiring each carrier to "staff its security screening checkpoints with [such] personnel in accordance with the standards specified in its security program"). In fact, the FAA's response in the NPRM to anticipated concerns about the lack of specificity in the rules was that it was adding to the security programs more detailed requirements which would "improve the level of first-line supervision over screening activities," 56 Fed.Reg. at 13,554, and "strengthen" "current [training] standards." *Id.* at 13,555. We can appreciate petitioners' frustration at being told, in essence, to accept on faith the FAA's representations that it was complying with ASIA.

■ Nevertheless, under the first step of the *Chevron* analysis, we agree with the FAA that ASIA does not repeal its preexisting authority to regulate air traffic security through the security programs. Since 1972, the FAA has required air carriers and airports to have and comply with FAA-approved security programs addressing such issues as security screening and crew member security training. *See* 14 C.F.R. §§ 108.5, 108.7 (1992). In 1974, Congress amended the Federal Aviation Act to permit the FAA, by implementing regulation, "to prohibit disclosure of any information obtained or developed in the conduct of security or research and development activities, ... if ... disclosure ... would be detrimental to the safety of persons traveling in air transportation." 49 U.S.C.App. § 1357(d)(2)(C). Within two years, the FAA had promulgated rules interpreting § 1357(d)(2) to allow it to withhold, *inter alia,* security programs from the public, *see* 14 C.F.R. §§ 108.5, 108.7 (1992), and actually withholding such programs. *See* 14 C.F.R. § 191.3(b)(3)–(4) (1992). The FAA has not deviated from that interpretation.

Three months before it enacted ASIA in 1990, and in the wake of the bombing of Pan Am flight 103, Congress passed a statute permitting the FAA to approve an airport security program incorporating a tenant's security program, provided that both programs met certain statutory requirements. *See* Pub.L. No. 101–370, 104 Stat. 451 (1990) (codified at 49 U.S.C.App. § 1357(g)).[3] Finally, eleven days before ASIA's enactment, Congress broadened § 1357(d) to allow the FAA to withhold

---

**3.** Congress inadvertently included two section 1357(g)'s; we refer to the first subsection (g) entitled "Airport tenants security programs."

information developed during "security activities." Omnibus Budget Reconciliation Act of 1990, Pub.L. No. 101–508, 104 Stat. 1388 (1990) (codified at 49 U.S.C.App. § 1357(d)(2)).

From this flurry of legislative and administrative activity, we conclude that Congress clearly did not intend to repeal the FAA's preexisting authority to regulate the security of the American civil aviation system through the security programs. In reaching this conclusion, we are properly guided by the "ordinary canons of statutory construction," *INS v. Cardoza–Fonseca,* 480 U.S. 421, 449, 107 S.Ct. 1207, 1222, 94 L.Ed.2d 434 (1987), two of which we find particularly relevant here. The first is the "cardinal principle of construction that repeals by implication are not favored." *Silver v. New York Stock Exch.,* 373 U.S. 341, 357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389 (1963) (internal quotation marks omitted). The second is that "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 414 n. 8, 95 S.Ct. 2362, 2370 n. 8, 45 L.Ed.2d 280 (1975).

Here, Congress has been presumptively aware since 1972 that the FAA has been regulating airport and air carrier safety through individualized security programs. *Id.* In the intervening two decades, Congress has amended the Federal Aviation Act on several occasions and, on one of those occasions, expressly recognized the FAA's use of security programs. *See* 49 U.S.C.App. § 1357(g). Furthermore, ASIA, the statute which petitioners assert undoes all of the foregoing, contains no language suggesting that the FAA's authority to regulate via the security programs was at an end. Consequently, we have little difficulty concluding that ASIA does not repeal the FAA's authority to adopt carrier-specific security regulations in security programs.

As a result, the final rules may permissibly rely on the security programs. That raises the issue whether there was a legal basis for withholding the portions of the security programs relating to staffing and training from the public. We presently turn to that issue.

B. *The Relationship Between the APA, FOIA and Section 1357(d)(2) of the Federal Aviation Act*

Petitioners attempt to show that the FAA's decision to withhold the training and staffing requirements of the security programs under § 1357(d)(2) was improper under the publication and notice-and-comment requirements of FOIA and the APA, respectively. Section 1357(d)(2) empowers the FAA to withhold information, "[n]otwithstanding section 552 of Title 5 relating to freedom of information." 49 U.S.C.App. § 1357(d)(2). Petitioners argue that by expressly including this phrase, Congress plainly meant § 1357(d)(2) not to shield information from disclosure under any statute other than FOIA. Furthermore, they assert, until the FAA amends its regulations to reflect Congress's 1990 amendment to § 1357(d), which allowed the FAA to withhold information obtained or discovered in the conduct of "security activities," Omnibus Budget Reconciliation Act of 1990, Pub.L. No. 101–508, 104 Stat. 1388 (1990), security programs may not be withheld under § 1357(d). We reject both arguments.

Because § 1357(d)(2) is a part of the FAA's organic statute, the Federal Aviation Act, we accord *Chevron* deference to the FAA's interpretation of the section. For *Chevron* purposes, the precise question here at issue is whether the FAA may use § 1357(d)(2) to avoid disclosure under statutes other than FOIA. Unfortunately for petitioners, on that question § 1357(d)(2)'s "notwithstanding" wording is not clear and unambiguous. Although the phrasing clearly and unambiguously provides that § 1357(d), where applicable and invoked by the FAA, trumps FOIA's disclosure requirements, it says nothing at all about statutes other than FOIA. To be clear and unambiguous as to such statutes, the "notwithstanding" phrase would have to negate expressly the section's applicability to such statutes, which it obviously does

not do. *See* 49 U.S.C.App. § 1357(d)(2). Therefore, petitioners' plain-meaning argument fails.

Because § 1357(d)(2) is ambiguous on the issue under consideration, we inquire under *Chevron* whether, apart from the text, we can reach the "unmistakable conclusion that Congress had an intention on the precise question at issue." *Nuclear Info. Resource Serv. v. Nuclear Regulatory Comm'n*, 969 F.2d 1169, 1173 (D.C.Cir. 1992) (en banc) (internal quotation marks omitted). Here, our inquiry ends at that stage of the *Chevron* analysis because we conclude unmistakably that Congress intended to allow the FAA to withhold from public disclosure information falling within § 1357(d), whether or not FOIA is invoked.

While Congress was considering § 1357(d)(2), the FAA was involved in litigation with plaintiffs who sought disclosure of internal FAA reports under FOIA. In keeping with antecedent cases involving other federal agencies, *see Stretch v. Weinberger*, 495 F.2d 639 (3d Cir.1974); *see generally Stretch v. Weinberger*, 359 F.Supp. 702, 704 (D.N.J.1973) (citing district court decisions holding that internal agency documents must be disclosed under FOIA), *aff'd*, 495 F.2d 639 (3d Cir.1974), this Court held that the FAA's general statutory authority to withhold information where the public interest so requires was not specific enough to come within FOIA Exemption 3, 5 U.S.C. § 552(b)(3) (1988). *See Robertson v. Butterfield*, 498 F.2d 1031 (D.C.Cir. 1974), *rev'd sub nom. FAA v. Robertson*, 422 U.S. 255, 95 S.Ct. 2140, 45 L.Ed.2d 164 (1975).

Congress then enacted § 1357(d)(2), but only after adding the "notwithstanding" clause. That occurred before the Supreme Court's decision in *FAA v. Robertson*, 422 U.S. 255, 95 S.Ct. 2140, 45 L.Ed.2d 164 (1975), *superseded in part by statute*, Pub.L. No. 94–409, 90 Stat. 1242 (1976) (codified at 5 U.S.C. § 552b(c)(3)), which held that the FAA may withhold information, as required by the public interest, under FOIA Exemption 3. At that time, several lower courts, as previously stated, were of the contrary view, and Congress was presumptively aware of those lower court decisions. *See Cannon v. University of Chicago*, 441 U.S. 677, 696–97, 99 S.Ct. 1946, 1957–58, 60 L.Ed.2d 560 (1979) (holding that "[i]t is always appropriate to assume that our elected representatives, like other citizens, know the law"). We have little doubt that Congress added the "notwithstanding" clause to overrule those lower court cases.

Although Congress might have clarified the "notwithstanding" clause by changing the wording to "notwithstanding any other provision of law," our role is not to grade Congress on its draftsmanship, but rather to give effect to the intention of Congress, insofar as we can unmistakably discern it. *See Nuclear Info. Resource Serv. v. Nuclear Regulatory Comm'n*, 969 F.2d 1169, 1173 (D.C.Cir.1992) (en banc). Here, Congress's intent was to *broaden* the FAA's power to withhold sensitive information, *not* to limit that power, as petitioners suggest. Its limitation of the "notwithstanding" clause to FOIA is understandable, given that FOIA was the only statute anyone had invoked as of then to compel disclosure from the FAA. In short, Congress can hardly have intended for the FAA to be able to resist under § 1357(d)(2) a FOIA request for security-sensitive information, for example, but not a request for precisely the same information under another statute, such as the APA. Where disclosure of information specified in § 1357(d)(2) and the FAA's implementing regulations would jeopardize passenger safety, Congress clearly intended for the FAA to be able to withhold such information under § 1357(d)(2).

Shortly put, petitioners would read the disputed clause to mean that the FAA may withhold *only* if FOIA is invoked. The FAA reads it to apply *even* if FOIA is invoked. We think the FAA's reading is consistent with the plain intent of Congress so that we may uphold the Administration's interpretation at step one of the *Chevron* analysis. Insofar as there is ambiguity, the Administration would certainly prevail at step two. Therefore, we hold that § 1357(d)(2) allows the FAA to withhold security-sensitive information from mem-

bers of the public, regardless of the legal basis of the request for the information.

### C. *The FAA's Invocation of Section 1357(d)(2)*

■ Petitioners conclude with several arguments that the FAA improperly invoked its authority under 49 U.S.C.App. § 1357(d)(2) to withhold the training and staffing requirements of the security programs. They argue that producing minimum staffing and training requirements would not divulge "information" (as in "information obtained or developed in the conduct of research and development activities") within the meaning of § 1357(d). We regard that argument as foreclosed by common sense. Disclosing a requirement that, for example, each security screening checkpoint must be staffed with a minimum of four screening personnel during embarkation would disclose the following information—that, on the safe assumption that airports comply with the law, there will be at least four screeners at each checkpoint while passengers are boarding. Therefore, the disclosure petitioners seek would disclose "information" within the meaning of § 1357(d).

Petitioners' next argument is more substantial, but nonetheless unavailing. Although Congress amended § 1357(d)(2) in 1990 to allow the FAA to withhold "information obtained or developed in the conduct of security ... activities" as well as research and development activities, the FAA has yet to amend its regulations to reflect the 1990 amendment. Since § 1357(d)(2) is *not self-executing*—that is, it allows the Administrator to withhold information only under "such regulations as he may deem necessary," 49 U.S.C.App. § 1357(d)(2)—the FAA cannot withhold the security program rules as developed in security activities.

The problem with petitioners' argument is that it ignores the basis on which the FAA withheld the security programs. The FAA did not withhold the detailed training and staffing rules contained in the security programs as developed in the course of security activities. Rather, the FAA with-held those rules as developed in "research and development activities," a phrase the FAA has interpreted since 1972 to allow it to withhold security programs in their entirety. *See* 14 C.F.R. § 191.1 (1992) (interpreting 49 U.S.C.App. § 1357(d)(2) to allow the FAA to withhold security programs as information developed during research and development activities); 14 C.F.R. § 191.-3(b)(3)–(4) (1992) (withholding security programs under § 1357(d)(2)). Petitioners have not challenged that long-standing administrative interpretation, and we therefore have no occasion to decide whether the FAA's interpretation survives the *Chevron* analysis.

Petitioners' final argument is that the FAA erred in finding, under § 1357(d)(2)(C), that disclosure of the security programs' detailed training and staffing requirements "would be detrimental to the safety of persons traveling in air transportation." 56 Fed.Reg. at 13,552. Petitioners argue, albeit tepidly, that we review that finding *de novo*. We disagree.

■ The applicable standard of review for FAA action is provided by the Federal Aviation Act and, by default, the APA. Under the Federal Aviation Act, we review the FAA's findings of fact merely to see whether they are "supported by substantial evidence." 49 U.S.C.App. § 1486(e) (1988). Findings of fact that are so supported are "conclusive" and may not be disturbed on appeal. *Id.* In view of § 1486's silence as to the standard for reviewing nonfactual matters, the standard of review for such matters "is provided by section 10(e) of the Administrative Procedure Act." *Advanced Micro Devices v. Civil Aeronautics Bd.*, 742 F.2d 1520, 1527 (D.C.Cir.1984). We believe the Administrator's determination under § 1357(d)(2) that greater disclosure would jeopardize passenger safety is more than just a finding of fact—it is a prediction of the likely future effect of disclosure. Thus, to the extent we review the FAA Administrator's determinations under § 1357(d)(2) at all, we do so under the APA, with "the utmost deference in view of administrative expertise."

*Pillai v. Civil Aeronautics Bd.*, 485 F.2d 1018, 1027 (D.C.Cir.1973).

Section 10(e) of the APA allows reviewing courts to set aside only agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1988). The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result, *see Federal Election Comm'n v. Rose*, 806 F.2d 1081, 1088 (D.C.Cir.1986), and respond to "relevant" and "significant" public comments. *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 & n. 58 (D.C.Cir.), *cert. denied*, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977). However, neither requirement is particularly demanding.

■ Courts "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974). With regard to responding to public comments, it is settled that "the agency [is not required] to discuss every item of fact or opinion included in the submissions made to it in informal rulemaking." *Automotive Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330, 338 (D.C.Cir.1968); *cf. Simpson v. Young*, 854 F.2d 1429, 1435 (D.C.Cir.1988) ("[t]he agency need only state the main reasons for its decision and indicate it has considered the most important objections"). Instead, the agency's response to public comments need only "enable us to see what major issues of policy were ventilated ... and why the agency reacted to them as it did." *Automotive Parts*, 407 F.2d at 335. Indeed, the agency need not respond at all to comments that are "purely speculative and do not disclose the factual or policy basis on which they rest." *Home Box Office*, 567 F.2d at 35 n. 58.

■ We agree with the FAA that its security rationale was adequately explained and rational.[4] It appears that the most substantial objection raised to the ra-

tionality of the FAA's perceived security threat came from Billie H. Vincent, who argued that disclosing greater detail about air carrier security systems would pose a risk to passenger safety only if the standards to be disclosed were inadequate. The FAA's response—that if the information sought by petitioners, Vincent and others "became available to a person with criminal or terrorist intent, it could focus that person's attention on specific techniques to counter otherwise effective security systems," 56 Fed.Reg. at 13,555—was an entirely adequate response. Implicit in the FAA's explanation is the sensible notion that armed with detailed information, not to mention the tools of their deadly trade, potential terrorists might be able to evade *any* security system, for no security system is perfect. To the extent the comments rested on a different premise, they were speculative and therefore undeserving of further response by the FAA.

While the FAA did not directly respond to the comment stating that any member of the public could observe the number of screeners at a given security checkpoint, the FAA did not have to because that claim was speculative. Also speculative were comments stating without elaboration that disclosure, for example, of the number of hours of training to be required in discrete subjects would not threaten security. We reiterate that to require response by the agency, comments must do more than simply state that the agency's premises or conclusions are wrong; they must explain why and on what basis the agency assertedly has erred. *See, e.g., Home Box Office*, 567 F.2d at 35 n. 58. Accordingly, we hold that the FAA adequately explained its rational determination that providing greater specificity in the final rules would jeopardize passenger safety.

### III. Conclusion

■ To summarize, the FAA permissibly concluded that ASIA does not impliedly repeal its preexisting authority to promul-

---

4. We therefore need not consider the FAA's argument that the individualized nature of train-

ing and staffing rules makes it difficult to provide more detail in rules of general application.

gate and withhold from the public security-sensitive rules and other information under 49 U.S.C.App. § 1357(d)(2). The FAA properly invoked § 1357(d)(2). In view of those conclusions, the rules the FAA adopted, in conjunction with the rules that have been, or are being, developed in the security programs, satisfy ASIA's demand for "minimum training requirements" and "minimum staffing levels." *Id.* § 1357(h). Accordingly, petitioners' motion to supplement the record with the FAA's security-sensitive rules and the petition for review is, in all respects,

*Denied.*