MILK TRAIN, INC., et al., Appellants,

v.

Ann M. VENEMAN, Secretary, United
States Department of Agriculture,
Appellee.

No. 01–5310.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 10, 2002.

Decided Nov. 15, 2002.

Benjamin F. Yale argued the cause for appellants. With him on the briefs were Kristine H. Reed, Donald M. Barnes, and Lowell H. Patterson III.

H. Thomas Byron III, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief were Roscoe C. Howard, Jr., U.S. Attorney, and Mark B. Stern, Attorney, U.S. Department of Justice.

Before: SENTELLE, ROGERS and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

Dissenting opinion filed by Circuit Judge SENTELLE.

ROGERS, Circuit Judge:

The question in this appeal is whether the Secretary of Agriculture's implementation of a 1999 subsidy program for milk producers was inconsistent with the statutory requirement that payments be made "for economic losses incurred during 1999." Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act 2000, Pub.L. No. 106–78, § 805, 113 Stat. 1135, 1179 (1999) [hereinafter "2000 Appropriations Act"]. The Secretary's regulations defined "eligible production" for purposes of determining how much money a producer could receive as "milk produced by cows in the United States and marketed commercially in the United States anytime during the 1997 and or 1998 calendar year,

subject to a maximum of 26,000 [hundredweight ("cwt")] per dairy operation." 7 C.F.R. § 1430.502. Milk Train, Inc. and others representing thirty-one large milk producers in several states, appeal the grant of summary judgment upholding the Secretary's regulations. Milk Train contends that the regulations are contrary to a clear statutory mandate and that the Secretary arbitrarily denied assistance for losses attributable to production in excess of 26,000 cwt. Insofar as Milk Train challenges the 26,000 cwt cap, we vacate the district court opinion on that issue for lack of jurisdiction; otherwise we reverse and remand the case to the district court with instructions to remand the case to the Secretary.

## I.

In the last three fiscal years (FY 1999—FY 2001), Congress has appropriated money to be distributed by the Secretary of Agriculture to compensate dairy producers for losses they have sustained. We refer to the moneys appropriated as a milk producers' subsidy in the 1999 Appropriations Act as the 1998 Program; we refer to the moneys appropriated in the 2000 Appropriations Act as the 1999 program.

In the first year, Congress provided over $3 billion "for assistance to owners and producers on a farm ... to partially compensate [them] for the loss of markets for the 1998 crop of a commodity." Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub.L. No. 105–277, Division A, § 101(a), Tit. XI, § 1111(a), 112 Stat. 2681, 2681–44 (1998) [hereinafter "1999 Appropriations Act"]. In particular, Congress directed that $200 million of the moneys "shall be available to provide assistance to dairy producers in a manner determined by the Secretary." *Id.* § 1111(d). For the 1998 program, the Secretary promulgated regulations whereby the amount of each farm's payment would be based on 1997 or 1998 milk production, with a cap on the maximum eligible production level, approximately equivalent to a herd of 150 cows (or 26,000 cwt, which represents 2,600,000 pounds of milk). *See* 7 C.F.R. §§ 1430.502, .504, .506. A cost benefit analysis prepared by the Farm Service Agency ("FSA") on December 21, 1999, indicated that 76,771 milk producers that were in production at some time during the period October 2, 1998, through December 31, 1998, were sent checks in June 1999 based on a payment rate of 22.47897 cents per cwt, with a maximum single payment of $5,845.

In the second year, at issue here, Congress appropriated $325 million more to benefit livestock and dairy producers, again directing that the funds be disbursed "in a manner determined appropriate by the Secretary." 2000 Appropriations Act § 805. Congress directed that no less than $125 million (minus administrative expenses of $2.3 million) be in the form of assistance to dairy producers "to compensate producers for economic losses incurred during 1999." *Id.* §§ 825, 822. Waiving the notice and comment requirement for implementing regulations, Congress directed that the payments be made "as soon as practicable." *Id.* § 824(a). For the 1999 program, the Secretary extended the regulations for the 1998 program; she specifically extended sign-up for the subsidy program through February 28, 2002, with the proviso that "[d]airy operations that applied for and received payments under the [1998 program] do not need to reapply. Additional payments will be issued based upon the original application." 1999 Crop and Market Loss Assistance, 65 Fed.Reg. 7942, 7945 (Feb. 16, 2000). According to the FSA's cost-benefit analysis, the sign-up was extended to permit the 1,100 eligible commercial operations that did not enroll in the 1998 program to enroll in the 1999 program. Payments under the 1999 program for

producers who had signed up for the 1998 program (or were eligible for that program) were based on the 1997 or 1998 production figures used for the 1998 program. 65 Fed.Reg. at 7945. Thus, producers who had signed up or were otherwise eligible for the 1998 program could receive 1999 funds, even if they did not produce in 1999. The final payment per cwt under the 1999 program was approximately $0.1405, with a maximum single payment of about $3,653.

Milk Train filed suit challenging the regulations for the 1999 program as arbitrary and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), and violative of the Non–Delegation, Takings, and Equal Protection Clauses of the Constitution. The district court, addressing cross-motions for summary judgment, viewed "[t]he essence of this controversy [to be] whether the Secretary exceeded her statutory authority by capping at 26,000 cwt the amount of milk production that would be eligible for financial assistance, the consequence of which was to bestow the bulk of the funding on smaller dairy farmers." The court granted judgment for the Secretary. As relevant here, the court ruled that it had jurisdiction because the 2000 Appropriations Act appropriating moneys for the 1999 program was not within the lump-sum appropriations exception to APA jurisdiction under *Lincoln v. Vigil,* 508 U.S. 182, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993), and contained intelligible principles, including Congress' general policy "to compensate dairy farmers suffering from declining milk prices." The court rejected Milk Train's argument that the Secretary's 26,-000 cwt cap was arbitrary and capricious. The court did not expressly address Milk Train's argument that the Secretary's use of data from an earlier year to allocate payment of 1999 moneys was arbitrary and capricious.

## II.

On appeal, Milk Train contends that the Secretary's regulations are invalid because they ignore the clear statutory mandate to compensate dairy producers for "economic losses incurred during 1999" and arbitrarily denied assistance for losses attributable to production in excess of 26,000 cwt. Pointing to the different statutory language that Congress used in appropriating funds for the 1999 program (referring to "producers" rather than "owners and producers" and to "economic losses" rather than "market losses," and to a different year), Milk Train contends that while Congress did not reinstate the 1998 program the Secretary did, by extending the regulations for the 1998 program, with the result that payments for 1999 economic losses were based on the same production data and paid to the same producers who qualified for the 1998 program rather than to those who operated in 1999. As to the 26,000 cwt cap, Milk Train contends that the phrase "in the manner authorized by the Secretary" was "not an expression in the alternative to compensation for the producers' 1999 economic losses" and did not authorize the Secretary "to deny compensation on substantial portions of the economic losses incurred in 1999 by some producers in order to increase the amounts received by others."

### A.

■ We first address the district court's jurisdiction to review the Secretary's regulations. *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 95, 118 S.Ct. 1003, 1012–13, 140 L.Ed.2d 210 (1998). According to the Secretary, her determination of the manner of providing the moneys to dairy producers is not qualified "in any way," Appellee's Br. at 15, and reflects a congressional judgment that the Agriculture Department, as the expert agency

charged with implementing the nation's farm policy, is best suited to determine how the moneys should be used to provide assistance to the nation's dairy farmers. Whether viewed as agency action committed to agency discretion by law under the APA, 5 U.S.C. § 701(a)(2), or as an express delegation to make all decisions necessary to carry out Congress' broad purpose, the Secretary contends that judicial review of the Secretary's implementation decision is "extremely circumscribed."

Section 701(a)(2) of the APA exempts agency action from judicial review "to the extent that [it] is committed to agency discretion by law." The Supreme Court in *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), held that an agency decision not to institute enforcement proceedings was unreviewable. *Id.* at 831, 105 S.Ct. at 1655–56. Such a decision, the Court explained, involved a "complicated balancing of a number of factors which are peculiarly within [an agency's] expertise." *Id.* Drawing on *Heckler*, the Court held in *Lincoln v. Vigil* that an agency decision to cease allocating funds from a lump-sum appropriation, which contained no restrictions on use of the funds, for a program not mentioned in a statute or the agency's regulations, was committed to agency discretion and likewise unreviewable. 508 U.S. at 192–93, 113 S.Ct. at 2031–32. The Court defined the scope of review precluded under § 701(a)(2) as turning on whether the statute "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Id.* at 191, 113 S.Ct. at 2030–31 (quoting *Heckler,* 470 U.S. at 830, 105 S.Ct. at 1655). The Secretary maintains that the principle set forth in *Lincoln v. Vigil* is not limited to lump-sum appropriations and would apply if the express conferral of discretion on the Secretary, as well as other characteristics of the administrative decision at issue, bring the

funding for the 1999 program within § 701(a)(2).

Insofar as Congress has left to the Secretary's sole judgment the determination of the manner for providing assistance to dairy farmers, we hold that the district court lacked jurisdiction to review Milk Train's challenge to the 26,000 cwt cap on eligible production. Congress provided that the moneys for 1999 economic losses were to be used "to provide assistance directly to ... dairy producers, in a manner determined appropriate by the Secretary." 2000 Appropriations Act § 805. Milk Train relies on *Whitman v. Amer. Trucking Ass'n,* 531 U.S. 457, 465–71, 121 S.Ct. 903, 908–11, 149 L.Ed.2d 1 (2001), to support its contention that the absence of express statutory authority for the Secretary to impose payment limitations makes the 26,000 cwt cap unlawful. But unlike the Clean Air Act provisions analyzed in *Whitman* that expressly limited the discretion of the Administrator by mandating the imposition of pollution regulations "requisite to protect the public health," 42 U.S.C. § 7409(b)(1), the plain language in the 2000 Appropriations Act indicates that Congress left to the Secretary the decision about how the moneys for 1999 economic losses could best be distributed consistent with its general policy to provide emergency assistance to dairy farmers "[a]s soon as practicable," *id.* § 824(a). The statute thus provides no relevant "statutory reference point" for the court other than the decisionmaker's own views of what is an "appropriate" manner of distribution to compensate for 1999 losses. *Drake v. FAA,* 291 F.3d 59, 72 (D.C.Cir.2002); *cf. Webster v. Doe,* 486 U.S. 592, 600–01, 108 S.Ct. 2047, 2052–53, 100 L.Ed.2d 632 (1988). A decision memorandum prepared for the Secretary in connection with the 1998 program described five options for allocating the moneys, each containing a listing of the pros and cons of each option.

Choosing between those options clearly requires "a complicated balancing of a number of factors which are peculiarly within [the Secretary's] expertise." *Lincoln*, 508 U.S. at 193, 113 S.Ct. at 2032 (quoting *Heckler*, 470 U.S. at 831, 105 S.Ct. at 1655). Milk Train does not dispute that the Secretary used the 1999 program funds to provide assistance to compensate dairy producers for their losses; it challenges the 26,000 cwt cap based on the distribution of those funds among eligible producers. Accordingly, we vacate the district court's opinion on the issue of the 26,000 cwt cap for lack of subject-matter jurisdiction. *Foodservice & Lodging Inst., Inc. v. Regan*, 809 F.2d 842, 847 (D.C.Cir. 1987) (per curiam).

■ We reach a different conclusion with regard to Milk Train's base-year challenge to the Secretary's regulations. By providing in the 2000 Appropriations Act that the moneys are for "economic losses incurred during 1999," 2000 Appropriations Act § 805, Congress limited the Secretary's authority to disburse funds. This limitation affords a "statutory reference point" by which the court is able to review the Secretary's determination of which producers are eligible to receive funds under the 1999 program. *Drake*, 291 F.3d at 72. Hence, we hold that the district court had jurisdiction of Milk Train's base-year challenge.

### B.

Milk Train's base-year challenge to the Secretary's regulations has two prongs, both of which are founded on the premise that there is no statutory basis for the use of 1997 and 1998 production data for calculating 1999 losses and on the dilution of 1999 moneys. The 2000 Appropriations Act requires that the moneys are to be used to reimburse dairy producers for "economic losses incurred during 1999." 2000 Appropriations Act § 805. Milk

Train contends that "the Secretary did not compensate producers for their 1999 economic losses but, instead, used the same time period and formula used to compensate for 1998 market losses—losses for which producers had already been paid once." Consequently, the moneys available to producers (such as appellants) who were eligible were diluted. There are two prongs to Milk Train's base-year challenge, for the 1999 funds were diluted, it maintains, either (1) because some producers who received 1999 program moneys were not in business in 1999 (and thus suffered no losses) or (2) because some producers were paid at a higher rate per cwt on 1997 or 1998 production based on the earlier 1998 program.

■ Even though presented as a part of its challenge to the 26,000 cwt cap, Milk Train's base-year argument appears throughout this case and is not the type of "asserted but unanalyzed" contention that the court should not address; the Secretary received fair notice of the argument and had an opportunity to respond. *See SEC v. Banner Fund Int'l*, 211 F.3d 602, 613 (D.C.Cir.2000) (quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C.Cir.1983)); *cf. Singleton v. Wulff*, 428 U.S. 106, 120–21, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976). During the hearing on the cross-motions for summary judgment the district court sought the Secretary's response to Milk Train's base-year argument, and the Secretary responded that:

> [w]hen the payments were made [for the 1998 program] the most recent figures that were available for production were the '97 and '98 years. When payments were made under the [1999] program, the easiest and quickest thing to do administratively was to use the same production figures for existing farmers and allow new farmers to file new applications. . . .

Again on appeal, the Secretary presents an administrative efficiency response but also explains that "the use of 1997 or 1998 production quantity information as the basis for calculating payment amounts does not constitute a payment based on losses incurred during those years. Rather, the Secretary merely used those figures to allocate a limited pool of money. . . ." Appellee's Br. at 21. Accordingly, we proceed to address the merits of Milk Train's base-year challenge.

■■■■ Our review of the grant of summary judgment is *de novo*. *Milk Indus. Found. v. Glickman*, 132 F.3d 1467, 1473 (D.C.Cir.1998). In addressing Milk Train's challenge to the Secretary's choice of a base year as contrary to law under the APA, the court accords special deference to the Secretary's interpretation of a statute that Congress has authorized the Secretary to implement. *See ABF Freight Sys., Inc. v. NLRB*, 510 U.S. 317, 324, 114 S.Ct. 835, 839–40, 127 L.Ed.2d 152 (1994); *Schweiker v. Gray Panthers*, 453 U.S. 34, 44, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981). So long as the regulations reflect a permissible interpretation of the statute, the court owes deference to the Secretary. *See Transitional Hosps. Corp. of La. v. Shalala*, 222 F.3d 1019, 1025 (D.C.Cir. 2000) (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984)). The court likewise owes deference to the Secretary's interpretation of her regulations. *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). It remains incumbent upon the Secretary to explain as part of the regulatory proceedings how the chosen manner of distributing the moneys extends only to the losses covered by the statute or risk vacation of the rule. *See Int'l Union, United Mine Workers v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, 966–67 (D.C.Cir.1990); *see also Checkosky v. SEC*, 23 F.3d 452, 463 (D.C.Cir.1994) (separate opinion of Silberman, J.).

We begin with the shared assumption of the parties, as stated in Milk Train's brief, that "[t]he simple and logical approach to compensating for economic losses incurred in 1999 would be to pay producers a fixed amount per hundredweight on all of their 1999 production—the same production impacted by lower BFP [basic formula price] prices." Appellant's Br. at 11; *see* Appellee's Br. at 13. Because the economic losses to producers in 1999 were due primarily to the collapse of milk prices in 1999, tying the level of payments to a dairy operation's level of production seems a reasonable conclusion by the Secretary, and Milk Train does not challenge it. Indeed FSA's cost-benefit analysis indicates that in October 1999 manufacturing milk prices suffered the second largest month-to-month drop, that the November 1999 basic formula price was the lowest in 21 years, and that prices were expected to remain low throughout FY 2000 at over 20% less than the record high level of FY 1999. Anticipating that the assistance provided by the 1999 program "will offset only a modest portion of the expected decline in dairy producers['] incomes as prices decline," the assessment added that the number of commercial dairy operations declined about 4.2% between July 1998 and July 1999.

■■ The record indicates that the Secretary did consider requiring producers who had received payments under the 1998 program to reapply for compensation from the 1999 program. A decision memorandum prepared for the Secretary agreed that such a system would "target 1999 production," but concluded that such a system would significantly delay payments to producers, place additional workload on agency field offices, and require additional resources to develop new computer soft-

ware to handle the new program. The decision memorandum also discussed using only the lists of producers who had participated in the 1998 program (including the data for their 1997 or 1998 levels of production) to determine eligibility and payment levels for the 1999 program. Such an approach would greatly reduce administrative costs and the time required to provide payments to producers, but, according to the decision memorandum, "the payments distributed under the previous [1998] program will not reflect current operations" and new operations in 1999 would be unable to take advantage of the funding for 1999 losses. Instead, the Secretary chose the approach whereby the eligibility and payment levels for the 1999 program for all producers who had already participated in the 1998 program were to be determined from the 1997 or 1998 data used in the 1998 program. 65 Fed.Reg. at 7945. For those who had failed to participate in the 1998 program, they could apply, provided they had production in the fourth quarter of 1998, with the basis for establishing payment amounts being the higher of 1997 or 1998 production levels. For producers who had begun production in 1999, new applications with 1999 data could be submitted. This approach was preferable, the decision memorandum concluded, because it would allow new producers to participate in the program, while minimizing the administrative costs and time required for implementing the program with respect to the vast majority of dairy producers.

In selecting this approach, the Secretary considered the risk that the use of 1997–98 production data would inaccurately measure the level of 1999 production (and therefore, the level of 1999 economic losses), and concluded that the benefit of increased accuracy was not worth the additional delay in distributing funds and the administrative costs. The FSA cost-benefit assessment stated that it could be ex-

pected that "about 1.5 percent of the recipients of the [1999 program moneys] would not have been in operation in 1999" but concluded that "[t]he chance of including operations in the [1999] program which did not farm in 1999 was not great enough to justify requiring 76,771 operations to re-enroll." The parties agree that production levels are an appropriate proxy for economic losses. Based on the parties' agreement and the above analysis, it would appear to follow that the Secretary could reasonably conclude, in light of the dramatic drop of milk prices in 1999, that all milk producers would suffer economic losses in 1999 and consequently measuring production was a reasonable way to measure economic losses. As the Secretary explains in her brief, under the circumstances, use of the 1997 or 1998 production data was an efficient way to allocate limited moneys promptly.

The analysis underlying the Secretary's approach using 1997 and 1998 production data is logically sound, for any measurement by the Secretary of the amount of 1999 production would be subject to some level of uncertainty because of measurement errors and incomplete reporting. The trade-off between the amount of uncertainty and error that is acceptable in view of the congressional purpose to get aid promptly to milk producers, *see* 2000 Appropriations Act § 824(a), and the considerable time and money that the Agriculture Department would have to expend to reduce that uncertainty and error, is the type of issue for which courts show great deference. An agency "typically has wide latitude in determining the extent of data-gathering necessary to solve a problem." *Allied Local & Reg'l Mfrs. Caucus v. U.S. Envtl. Prot. Agency,* 215 F.3d 61, 71 (D.C.Cir.2000) (quotation omitted), *cert. denied* 532 U.S. 1018, 121 S.Ct. 1956, 149 L.Ed.2d 752 (2001); *see also Nat'l Ass'n of Mfrs. v. United States Dep't of Interior,*

134 F.3d 1095, 1108 (D.C.Cir.1998). The Secretary's explanation of her approach using prior-year production data is sufficiently clear in light of the FSA cost-benefit analysis and the decision memorandum on options for payment that "the agency's path may reasonably be discerned." *Pub. Citizen, Inc. v. FAA,* 988 F.2d 186, 197 (D.C.Cir.1993) (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974)). Thus, the first prong of Milk Train's base-year challenge—to use of prior-year production data—fails.

■ The second prong of Milk Train's base-year challenge is more problematic for the Secretary. Here, Milk Train contends, some producers were paid at a higher rate per cwt on 1997 and 1998 production based on the 1998 program. Based on Milk Train's contention and our review of the record, it appears that even if the Secretary's approach to the use of prior-year production data was otherwise reasonable, the Secretary did not apply it consistently. As pointed out by Milk Train, the Secretary, in interpreting the regulations, did not simply use the 1997 and 1998 data to estimate 1999 levels of production and thus 1999 economic losses. Instead, in providing guidance for implementation of the 1999 program, the Secretary apparently instructed field offices to use the 1997 and 1998 data to allow dairy producers to collect funds from the 1999 program as compensation for losses in 1997 and 1998. Specifically, the Secretary instructed those offices to accept applications from dairy producers who had not received funds under the 1998 program but had been in operation in the last quarter of 1998 (whether or not they were in production in 1999). The Secretary further instructed those offices that "[p]roducers who did not receive payments under the initial [i.e., 1998] program will receive a payment calculated at the initial [i.e., 1998] payment rate."

The language in the 2000 Appropriations Act indicates that Congress was not simply adding funds to a pool of money that it had appropriated the prior year so any losses occurring from the start of the 1998 program through the end of the 1999 program would be eligible for payment out of the pool that included the 1999 moneys; rather, Congress limited the moneys designated for dairy producers in the 2000 Appropriations Act to payment of "economic losses occurring during 1999." 2000 Appropriations Act § 805. Yet the Secretary's interpretation of the regulations, as shown by the Secretary's implementing guidance, appears to authorize the use of 1999 moneys to pay for non–1999 economic losses in addition to 1999 losses. It may well be that the Secretary's guidance was intended merely to instruct that for those dairy producers who did not participate in the 1998 program a greater proportion of their 1999 losses would be compensated under the 1999 program. If this is what the Secretary intended, as is suggested by the Secretary's argument in her brief that reliance on prior-year data was merely an allocation tool that did not result in payment of non–1999 losses out of 1999 funds, then the implementing guidance involves the manner of distribution over which the court has no jurisdiction to review. *See supra* Part IIA. But as the administrative record now stands, the court is unable to determine whether the Secretary's interpretation of the regulations was inconsistent with the plain language of the 2000 Appropriations Act, and as such, contrary to law. *Cf. FPC v. Texaco, Inc.,* 417 U.S. 380, 395–96, 94 S.Ct. 2315, 2325–26, 41 L.Ed.2d 141 (1974).

## C.

■ The decision whether to remand or vacate "depends on [1] the seriousness of

the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and [2] the disruptive consequences of an interim change that may itself be changed." *Allied–Signal Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C.Cir.1993) (quoting *Int'l Union, United Mine Workers*, 920 F.2d at 967); *see County of Los Angeles v. Shalala*, 192 F.3d 1005, 1023 (D.C.Cir. 1999); *Radio–Television News Dirs. Ass'n v. FCC*, 184 F.3d 872, 887–89 (D.C.Cir. 1999); *Checkosky v. SEC*, 23 F.3d at 462–66 (separate opinion of Silberman, J.). While the deficiency in the regulations arising from the Secretary's interpretation is not insignificant insofar as it may have resulted in use of 1999 moneys to pay for economic losses not incurred during 1999, this second prong of Milk Train's base year challenge was not its most prominent argument. In our view, there is at least "a serious possibility" that the Secretary on remand could explain her use of the 1999 funds in a manner that is consistent with the statute or choose an allocation method to correct the problem, a factor that favors remanding rather than vacating. *See Allied–Signal*, 988 F.2d at 151. Moreover, Milk Train's request for a remand for a new rulemaking ignores the second prong of the *Allied–Signal* test. As in *Sugar Cane Growers Coop. v. Veneman*, 289 F.3d 89 (D.C.Cir.2002), where the Secretary had improperly disbursed large quantities of sugar to farmers across the country, who in turn had already plowed under their crops, the Secretary here has already disbursed the 1999 program moneys to numerous dairy producers throughout the country, and those moneys may not be recoverable three years later. Here, as there, "[t]he egg has been scrambled and there is no apparent way to restore the status quo ante." *Id.* at 97.

Therefore, as in *County of Los Angeles*, where the court similarly found the Secretary's explanation for using prior-year data in a rulemaking procedure inconsistent, we conclude that a remand is the appropriate course. 192 F.3d at 1023. The court, of course, expresses no opinion on what might be a permissible manner of allocation based other than on production data. Our remand does not bind the agency to its current reasoning, approach, or decision. *Southeastern Mich. Gas Co. v. FERC*, 133 F.3d 34, 38 (D.C.Cir.1998).

Accordingly, we vacate that portion of the district court's opinion that discusses the Secretary's use of a 26,000 cwt cap for lack of jurisdiction, and we reverse the grant of summary judgment and remand the case to the district court with instructions to remand to the Secretary, in light of the inconsistent application of the Secretary's approach for using 1997 and 1998 production data to allocate 1999 moneys.

SENTELLE, Circuit Judge, dissenting:

While I agree with much of what the majority has to say, ultimately I would reach a different result for somewhat different reasons. I will not bother to rehash the facts well stated by the majority, but instead, I must say that I find the Secretary's blatant use of 1998 losses to disburse funds appropriated by Congress "for economic losses incurred during 1999" unworthy of the elaborate defense offered by the majority. As the majority recognizes, the Secretary is empowered "to compensate producers for economic losses incurred during 1999." 2000 Appropriations Act § 805. The Secretary advanced a formula compensating dairy farmers for production during 1997 or 1998. I would not defer to that decision. Granted, *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), requires us to defer in appropriate cases to an agency's choice "based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782.

However, that deference is called down only when "the statute is silent or ambiguous with respect to the specific issue." *Id.* I find no ambiguity in the term "1999" that would permit it to be construed as meaning "1998." I therefore would get off at the first step of *Chevron*: "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. at 2781–82.

By way of examples of the operation of the Secretary's complex departure from an unambiguous congressional instruction, if a milk producer operated a dairy in 1997 and through the first week of October in 1998, and thereupon ceased production, he would have incurred no loss in 1999. Under the unambiguous instruction of Congress, he would be entitled to no compensation from the fund at issue. Under the Secretary's application, he would receive compensation based on his production in 1997. Another producer, having suffered difficulties in 1997 and 1998 resulting in reduced milk production but having restored her herd to full producing potential in 1999, would likely have suffered compensable losses in 1999, given the market situation data relied upon by the Secretary. However, any compensation she received would be based not upon her 1999 losses, but upon a figure derived from a presumptive loss incurred based on her 1997 and 1998 reduced milk production, and presumably a lower figure than that to which she would be entitled for 1999. The Secretary admits that this methodology will admit into the pool of eligible applicants for a limited fund some number of dairy producers who no longer produced milk in the calendar year stated in the statute. Given that it is a fixed and limited fund, this inevitably reduces the amount available for distribution to producers eligible under the statutory criterion.

The majority accepts as a reasonable explanation the elaborate interpretation that using 1997 or 1998 levels of production to determine payments was really an efficient method of paying for losses in 1999. Assuming without conceding the reasonableness of the explanation proffered, I would reject it in any event. The analysis finds little basis in the administrative record, but is largely a product of the appellate brief cited by the majority in support of the reasonableness of the explanation. "We do not generally give credence to such post hoc rationalizations, but rather 'consider only the regulatory rationale actually offered by the agency during the development of the regulation.'" *Gerber v. Norton,* 294 F.3d 173, 184 (D.C.Cir. 2002) (quoting *Grand Canyon Air Tour Coalition v. FAA,* 154 F.3d 455, 469 (D.C.Cir.1998)). I would apply our normal rule and reject the *post hoc* explanation advanced by the Secretary's appellate counsel and refined by the majority today.

Having determined that I would reject the Secretary's compensation scheme, I, like the majority, am left with the question of what remedy is then appropriate. Once again I part company with the majority. I would not simply remand, but would vacate. In my view, "[o]nce a reviewing court determines that the agency has not adequately explained its decision, the Administrative Procedure Act requires the court—in the absence of any contrary statute—to vacate the agency's action." *Checkosky v. SEC,* 23 F.3d 452, 491 (D.C.Cir.1994) (Randolph, J., concurring). As Judge Randolph noted in his opinion in *Checkosky,* the APA states as much "in the clearest possible terms. [The Act] provides that a 'reviewing court' faced with an arbitrary and capricious decision '*shall* ... hold unlawful and set aside' the agency action." *Id.* (quoting 5 U.S.C. § 706(2)(A)).

Granted, cases such as *County of Los Angeles v. Shalala*, 192 F.3d 1005 (D.C.Cir.1999), provide precedent for the authority of the court to remand without vacating, as the majority holds today. Nonetheless, even if we are empowered to depart from the literal command of the language—a proposition which in the absence of such precedent I would find surprising—I think it often, if not ordinarily, unwise. *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), among many other cases, establishes the proposition that courts are not to substitute their administrative judgments for those of the agency. Any time that the agency has not adequately justified its decision, we do not know what the agency's decision would have been had it subjected the questions before it to the lawful administrative process. Therefore, when we hold that the conclusion heretofore improperly reached should remain in effect, we are substituting our decision of an appropriate resolution for that of the agency to whom the proposition was legislatively entrusted. I therefore cannot concur.

For a similar reason, I would vacate not only the use of the wrong annual losses for the determination of the amount of relief offered, but the regulation in its entirety, including the limitation of compensation to 26,000 cwt of production. Granted, the Secretary and the majority make out a good case for the unreviewability of that element of decision. Had that question come to us unaccompanied by the primary issue upon which I would vacate, I likely would have joined the majority's decision that it is unreviewable. But, as the Supreme Court reminded us in *Heckler v. Chaney*, as relied upon by the majority, the decisions of the agency involve a " 'complicated balancing of a number of factors which are peculiarly within [an agency's] expertise.' " Maj. Op. at 751 (quoting *Heckler v. Chaney*, 470 U.S. at 831, 105 S.Ct. at 1655). Since I would

vacate the unauthorized year, I am unable to ascertain whether the agency would have employed the same production cap had it used the right production year, and therefore I would be left with no choice but to remand this case to the district court for an order vacating the Secretary's decision and remanding the matter to the Secretary for further proceedings applying the correct statutory allocation.

Although I greatly respect the majority's attempt to save a well-intended relief program from possibly inefficient further proceedings, I do not think we can lawfully do so. I therefore most respectfully dissent.